## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY GIBRIANO, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>EISAI INC., ARENA PHARMACEUTICALS, INC.,<br><br>     Defendants. | Civil Action No.  2:21-cv-19937<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Amy Gibriano ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Eisai Inc. ("Eisai") and Arena Pharmaceuticals, Inc. ("Arena") (Eisai and Arena are collectively referred to as "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.   This is a class action lawsuit regarding Defendant Eisai and Arena's manufacturing and distribution of the weight loss medications Belviq® and Belviq XR (collectively "Belviq Medications" or the "Products") that exposed unknowing users to a significantly elevated risk of cancer such that the United States Food and Drug Administration ("FDA") required that the Products be withdrawn from the market because the risk of taking the medication outweighed its benefit.  While Defendants withdrew the Products from the market and instructed users to stop taking the medications (because they are unmerchantable and not fit for use), Defendants have not refunded or provided restitution to Plaintiff or Class (defined

below) members to reimburse them for the money they paid out of pocket for these defective Products.

2.      Worse is that Defendants Eisai and Arena knew, from the early stages of research and development of these medications that they exposed users to high rates of cancer. Eisai and Arena nevertheless pushed the product to market and sold tens of millions of dollars, or more, of these defective medications to Plaintiff and Class members. That is until subsequent research further confirmed just how dangerous these medications are in terms of causing cancer among users, leading the FDA to request withdrawal of Belviq® and Belviq XR from the market on February 13, 2020. By that point, unfortunately, the damage had already been done because Plaintiff and Class members paid tens of millions of dollars for the defective Belviq medications. Defendants have profited by retaining these ill-gotten gains at the expense of Plaintiff and Class members.

3.      Belviq® and Belviq XR are brand-name, prescription weight loss medications that contain the active ingredient lorcaserin. Lorcaserin is in a class of medications called serotonin receptor agonists. It is intended to reduce appetite by increasing feelings of fullness. This is achieved by activating a type of serotonin receptor known as the 5-HT2C receptor in the hypothalamus, a region of the brain known to control appetite. Originally developed by Arena, Belviq® was approved by the FDA in June 2012 as a prescription weight loss pill for obese individuals. Belviq XR is the extended-release version of the product, which was approved by the FDA in July 2016.

4.      On February 13, 2020, the FDA issued a "Drug Safety Communication" about Belviq Medications stating that the FDA was requesting the withdrawal of the products from the

market because the "potential risk of cancer outweighs its benefits."[1]  The FDA further explained

that it requested a voluntary withdrawal of Belviq Medications because "a safety clinical trial

shows an increased occurrence of cancer."[2]

5.      The substantial increase in the risk of cancer when using the medication was not

counterbalanced by efficacy.  The Belviq Medications were not particularly effective, achieving

only about a 5% weight loss for individuals who were already obese.  The ineffective nature of

the Belviq Medications was borne out over several clinical trials.  From September 2006 through

February 2009, Defendants conducted the Behavioral modification and Lorcaserin for

Overweight and Obesity Management (BLOOM) trial, a two-year, randomized, placebo

controlled, double-blind, multicenter clinical trial involving 3,182 patients to examine the

efficacy of lorcaserin in reducing body weight in the U.S. While weight reduction was seen in

the first year, all treatment groups experienced weight regain during the second year. In July

2010, the results of the BLOOM trial were published in the New England Journal of Medicine

(hereinafter referred to as "NEJM"). Smith S.R., et al. *Multicenter, Placebo-Controlled Trial of*

*Lorcaserin for Weight Management*. N. Engl. J. Med 2010;363:245-56.  From December 2007 to

July 2009, Defendants conducted the Behavioral modification and Lorcaserin Second Study for

Obesity Management (BLOSSOM) trial, a one-year randomized, placebo controlled, double

blind, parallel arm trial involving 4,008 patients to examine the effects of lorcaserin on body

weight, cardiovascular risk, and safety in the U.S. In July 2011, the results of the BLOSSOM

trial were published in the Journal of Clinical Endocrinology and Metabolism. Fidler, M.C., et al.

*A One-Year Randomized Trial of Lorcaserin for Weight Loss in Obese and Overweight Adults:*

---

[1] https://www.fda.gov/drugs/drug-safety-and-availability/fda-requests-withdrawal-weight-loss-drug-belviq-belviq-xr-lorcaserin-market (last visited 3/11/20).
[2] *Id.*

*the BLOSSOM trial.* J. Clin Endocrinol Metab 2011;96:3067-3077.  Combined data from the

BLOOM and BLOSSOM trials demonstrated only a 3.3% mean weight loss after one year with

lorcaserin over that of the placebo group, which failed to meet the mean efficacy criterion of

FDA's obesity draft guidance.

6.      As the FDA noted: "We are taking this action because we believe that the risks of

lorcaserin outweigh its benefits based on our completed review of results from a randomized

clinical trial assessing safety."[3]  Apprised of all of the relevant facts, no reasonable consumer

would choose to purchase the Belviq Medications, and no reasonable physician would prescribe

the Belviq Medications to patients.

7.      The FDA immediately instructed users of Belviq Medications to "stop taking

lorcaserin and talk to your health care professionals about alternative weight-loss medicines and

weight management programs."[4]  Users were instructed to dispose of unused medication by

taking it to a drug take back location or to discard the medication.[5]  Medical professionals can no

longer prescribe the medication.  This is a recognition of the fact that the Products are unfit for

their intended purpose as weight loss medications.

8.      The FDA also published its findings as to the increased cancer risk, stating:

> When FDA approved lorcaserin in 2012, we required the drug
> manufacturer to conduct a randomized, double-blind, placebo-
> controlled clinical trial to evaluate the risk of cardiovascular
> problems, which found that more patients taking lorcaserin (n=462;
> 7.7 percent) were diagnosed with cancer compared to those taking a
> placebo, which is an inactive treatment (n=423; 7.1 percent). The
> trial was conducted in 12,000 patients over 5 years. A range of
> cancer types was reported, with several different types of cancers
> occurring more frequently in the lorcaserin group, including

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

pancreatic, colorectal, and lung.[6]

9.      Patients like Ms. Gibriano and Class members who had previously paid substantial sums of money to purchase and use these medications suffered injury as a result of using the products.  Without insurance coverage, a one-month supply of Belviq Medications costs approximately $300.00.

10.     The dangerous nature of these medications was known to their manufacturers, who knew about the cancer risk from the early stages of research and development of the medications, well before the products were brought to market.  Nevertheless, Defendants Eisai and Arena pushed the products to market, minimizing and downplaying, and at times obfuscating the cancer risk, as described below.

**A.  Early Research Ties Use Of Belviq To Cancer**

11.     Arena undertook a long-term carcinogenicity rat study, beginning in 2007.

12.     In early 2007, the results indicated that lorcaserin was causing rare and aggressive tumors in rats, including lethal, malignant mammary and brain tumors.  Additional tumor formations included liver and thyroid, among others.

13.     Arena ultimately reported the tumor findings to the FDA.  In response, the FDA requested bi-monthly updates on the rat study.

14.     By week 96 of the study, the incidence and proportion of female rats with cancerous tumors increased at every dose.  This resulted in a meeting between Arena and the FDA.

15.     By week 104, however, the data began to change unexpectedly, citing a decline in malignant tumors.  However, Arena could not provide the FDA with supporting data to explain

---

[6] *Id.*

the sudden shift.

16.    By February of 2009, the rat study was completed and a draft of the study was sent to the FDA.  Tumor findings included mammary tumors at all doses, brain tumors, and other malignant tumors.

17.    Despite these findings, Arena pushed forward with the approval process.

**B.  Belviq's Troubled Approval Process**

18.    In December 2009, the first lorcaserin New Drug Application ("NDA") submission was sent to the FDA.  Defendant Arena Pharmaceuticals Inc. submitted the NDA for Belviq.

19.    In September 2010, the FDA advisory panel rejected approval of Belviq® due to safety concerns, specifically cancer risk, and because the product did not work well.[7] Specifically, the "FDA's advisory panel initially rejected Belviq® because of a risk of tumors found in animal studies."[8]  In October 2010, the FDA declined to approve the drug, consistent with the finding of the advisory panel, due to cancer promoting properties and marginal effectiveness.

20.    Despite these concerns, Arena re-submitted the NDA for Belviq®, which was accepted by the FDA in January 2012.

21.    Relying on questionable additional studies by Arena, the FDA ultimately approved lorcaserin with restrictions, namely that it could only be used for adults with a body mass index ("BMI") greater than 30, or those with BMI of 27 or more who have at least one

---

[7] https://www.wsj.com/articles/SB10001424052748703440604575496111194567530 (last visited 3/11/20).
[8] https://www.consumerreports.org/cro/news/2013/06/weight-loss-pill-belviq-is-now-available-but-we-say-skip-it/index.htm (last visited 3/11/20)

weight-related condition.

22.    The manufacturer was also required to conduct additional studies, including a long-term cardiovascular trial to assess the risk of Belviq® on risk for major cardiac events such as heart attack and stroke.  But, as the FDA noted in its Drug Safety Communication, this study ended up resurfacing the cancer concerns that Arena knew about from when they began the research in 2007, as discussed above.

C.  **Eisai and Arena Sell Belviq To Plaintiff and Class Members Despite The Known Defect In The Belviq Medications**

23.    Defendants Arena and Eisai jointly launched Belviq in the United States in 2012, pursuant to a Marketing and Supply Agreement originally entered into in 2010.  Specifically, pursuant to the original agreement, Eisai Inc. entered into an agreement with Arena "for exclusive U.S. rights to commercialize lorcaserin."[9]  Eisai published a notice announcing this agreement, and further noted that a NDA "for lorcaserin was submitted to the U.S. Food and Drug Administration (FDA) by Arena in December 2009. If approved, Eisai Inc. will exclusively market and distribute lorcaserin in the United States. Arena will handle the manufacture and supply of the finished commercial product at its facility in Switzerland."[10]  Arena and Eisai expanded the Marketing and Supply Agreement in 2012 to include additional countries beyond the United States.[11]

24.    Eisai was aware of the cancer concerns regarding the Belviq Medications as early as 2012.[12]  Nonetheless, for years thereafter up until the time when the Products were withdrawn from the market, Eisai aggressively marketed the defective Belviq Medications to physicians and

---

[9] https://www.eisai.com/news/news201035.html (last visited 11/8/21).
[10] *Id.*
[11] https://www.eisai.com/news/news201223.html (last visited 11/8/21).
[12] https://www.eisai.com/news/news201201.html (last visited 11/8/21).

consumers.

25.      Following FDA approval, Arena announced on its website that its then current

strategy was to first focus its efforts on the commercialization of Belviq in North and South

America pursuant to the terms of the Amended and Restated Marketing and Supply Agreement

with Eisai.

26.      On July 30, 2012, Eisai announced that "all rights pertaining to the New Drug

Application (NDA) (rights as the marketing authorization holder) for the antiobesity agent

BELVIQ® (lorcaserin HCl) have been transferred to [. . .] Eisai Inc. from Arena

Pharmaceuticals, Inc."  The release continued:  "With the NDA transfer, Eisai Inc. will become

the U.S. marketing authorization holder and will be responsible for commercialization of the

drug in U.S., including pharmacovigilance requirements."[13]

27.      On October 16, 2013, Eisai announced "Eisai Inc.[] has decided to increase the

number of sales representatives for the antiobesity agent BELVIQ® (lorcaserin hydrochloride)

by more than 200 contract employees to increase awareness and education about BELVIQ

among healthcare providers. The expansion will increase the sales force to approximately 400

sales representatives by December 2013, which is double the size from when BELVIQ became

available in June 2013, and will allow Eisai to provide information on the efficacy and safety of

the drug to approximately 65,000 healthcare professionals in obesity treatment throughout the

United States, including primary care providers."[14]  As such, Eisai knowingly and affirmatively

marketed the defective Belviq Medications to health care providers using knowingly false

information regarding the Products' efficacy and safety when Eisai knew that the Products were

---

[13] https://www.eisai.com/news/news201250.html (last visited 11/8/2021).
[14] https://www.eisai.com/news/news201359.html (last visited 11/8/21).

neither effective nor safe.  Eisai's efforts also extended to consumers themselves, including "programs for patient awareness and support."[15]

28.    Eisai's direct-to-consumer marketing campaign included television commercials that advertised Belviq as a safe and effective weight loss medication directly to consumers.[16] Eisai's marketing campaign also included ads in popular magazines such as *Cooking Light*, among others. None of these advertisements disclosed the true nature of the Products.  Each of these advertisements were designed to market the Products directly to consumers to induce consumers to purchase the Products based on Defendant's representations that the Products would be effective for weight loss.  Implicit in these advertisements is the notion that the Product is safe for its intended use and that the risks of the Products do not outweigh their benefit.

29.    On January 5, 2017, Eisai amended its agreement with Arena to secure a greater role in the marketing and sale of the Belviq Medications. Under the new agreement, Eisai acquires all of Arena's rights to develop and market [the Belviq Medications]."[17]  Under this revision, Eisai became "solely responsible for all decision-making and implementation related to global development and submissions for regulatory approvals, as well as global marketing for [the Belviq Medications]."[18]

**D.  Belviq Medications Are Withdrawn From The Market Due To Cancer Risk**

30.    On February 13, 2020, the FDA issued a "Drug Safety Communication" requesting withdrawal of Belviq® and Belviq XR from the market due to "increased occurrence of cancer" in the clinical trials.

---

[15] *Id.*

[16] *See, e.g.,* https://www.youtube.com/watch?v=5bYa6WcJ5Zc (last visited 11/8/21).

[17] https://www.eisai.com/news/news201701.html (last visited 11/9/21).

[18] https://www.eisai.com/news/news201701.html (last visited 11/9/21).

31.    The FDA stated in a news release that "clinical trials showed lorcaserin increased the risk of a number of cancers, including pancreatic, colorectal and lung."[19]

32.    Janet Woodcock, director of the FDA's Center for Drug Evaluation and Research, stated that patients should stop using the medications and talk to their health care professionals regarding a different treatment option.

33.    The FDA instructed users of the medications to return the medication to a drug return center or destroy the medication.  The reason that users were instructed to return or destroy the Products was because they were unfit for their intended use and unmerchantable as sold because the risks of using the Products outweighed any benefit of using them.

34.    The safety risks of the Belviq Medications are not mere conjecture; to date, multitudes of individuals have brought personal injury lawsuits related to their purchase and use of the Belviq Medications, including in this District.  *See, e.g., Quinn v. Eisai, Inc., et al.*, Case No. 2:21-cv-17670 (D.N.J.); *Brown v. Eisai, Inc., et al.*, Case No. 2:21-cv-16282 (D.N.J.). While this is not a personal injury action, Plaintiff and Class members should recover the purchase price paid for these defective medications, as well as statutory and exemplary damages. Defendants should not be permitted to retain ill-gotten gains from sales of the defective Products.

### E.  Plaintiff And Class Members Were Harmed By Purchasing And Consuming Defective Belviq Medications

35.    Plaintiff and members of the Class and New Jersey Subclass were injured by the full purchase price of their Belviq Medications because the risks of the medications outweighed their benefits such that the FDA required the medication to be withdrawn from the market.  Had Defendants Eisai and Arena been forthright with treating physicians and consumers regarding the

---

[19] https://www.cnn.com/2020/02/13/health/belviq-weight-loss-drug-cancer-fda/index.html (last visited 3/11/20).

animal studies conducted beginning in 2007, the true cancer risk of the medications, and the minimal effectiveness of the Products, no reasonable physician would have prescribed the Products to patients and no reasonable consumer would choose to purchase the medications. However, Defendants Eisai and Arena persisted in pushing the medications to market, reaping tens of millions of dollars of profit from unsuspecting consumers.  Because of the foregoing, the medications are not fit for human consumption.  Plaintiff and members of the Class are further entitled to statutory damages and for exemplary damages related to Defendants' conduct.

36.     Plaintiff brings this action on behalf of herself, the Class, and the New Jersey Subclass for equitable relief and to recover damages and restitution for: (i) breach of the implied warranty of merchantability, (ii) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§ 56:8-1 *et seq.*, and (iii) unjust enrichment.

## PARTIES

37.     Plaintiff Amy Gibriano is a citizen of New Jersey who resides in Annandale, New Jersey.  Plaintiff was prescribed, purchased and used Belviq® manufactured by Eisai and Arena, on several occasions in 2019.  Specifically, Ms. Gibriano purchased Belviq from a CVS location in new Jersey on or around May 22, 2019 and paid approximately $59.65 for the medication. Ms. Gibriano subsequently purchased Belviq from a CVS location in New Jersey on or around June 27, 2019 and paid approximately $40 for the medication.  Ms. Gibriano subsequently purchased Belviq from a CVS location in New Jersey on or around July 25, 2019 and paid approximately $40 for the medication.  Ms. Gibriano subsequently purchased Belviq from a CVS location in New Jersey on or around August 29, 2019 and paid approximately $40 for the medication.  Ms. Gibriano subsequently purchased Belviq from a CVS location in New Jersey on or around October 3, 2019 and paid approximately $40 for the medication.  Ms. Gibriano in fact

consumed all of the Belviq medication she purchased. At no time at the point of purchase, or

any time prior thereto, did Eisai or Arena inform Plaintiff that the medication unsafe and

ineffective such that the risks of the medication outweighed its benefit. When purchasing the

Product, Ms. Gibriano reasonable expected that the Product was safe (i.e. not carcinogenic) and

was effective for its intended purpose. If Plaintiff had known that the Product was in fact unsafe

(carcinogenic) and ineffective for its intended use, she would have been aware of that fact and

would not have purchased the medication. Ms. Gibriano also understood that in making the

sales, CVS was acting with the knowledge and approval of Eisai and Arena and/or as the agents

of Eisai and Arena. Ms. Gibriano also understood that each purchase involved a direct

transaction between herself and Eisai and Arena because her medication came with packaging

and other materials prepared by Eisai and Arena, including representations and warranties that

her medications were properly manufactured and free from defects. Defendants did not disclose

the dangers of the product to Plaintiff, nor did they advise Plaintiff that the risk of using the

Product outweighed any benefit of using the same.

  38.   Defendant Eisai Inc. is a corporation organized under the laws of Delaware with a

principal place of business at 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677. Eisai

Inc. is a wholly owned subsidiary of Defendant Eisai Co., Ltd. Eisai conducts substantial

business in the United States, and specifically in the State of New Jersey. Eisai has been

engaged in the manufacturing, distribution, and sale of defective Belviq® and Belviq XR in the

United States, including in the State of New Jersey.

  39.   Defendant Arena Pharmaceuticals, Inc. is a corporation organized under the laws

of Delaware with a principal place of business at 6154 Nancy Ridge Drive, San Diego,

California 92121. Arena conducts substantial business in the United States, and specifically in

the State of New Jersey. Arena has been engaged in the manufacturing, distribution, and sale of defective Belviq® and Belviq XR in the United States, including in the State of New Jersey.

## JURISDICTION AND VENUE

40. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

41. The Court has specific personal jurisdiction over each Defendant because Plaintiff purchased and consumed the defective Belviq medication in this District.

42. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because Defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of defective Belviq® and Belviq XR in this District; (b) conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## CLASS ALLEGATIONS

43. Plaintiff seeks to represent a class defined as all persons in the United States who purchased Belviq® or Belviq XR (the "Class").

44. Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities

related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

45.    Plaintiff also seeks to represent a subclass of all Class members who purchased Belviq® or Belviq XR in New Jersey (the "New Jersey Subclass").

46.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and New Jersey Subclass may be expanded or narrowed by amended complaint or at class certification.  The Class and New Jersey Subclass are collectively referred to as the "Classes."

47.    **Numerosity.**  The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class, and tens of thousands of members in the New Jersey Subclass.  Although the precise number of Class and New Jersey Subclass members is unknown to Plaintiff, the true number of Class and New Jersey Subclass members is known by Defendants and may be determined through discovery.  Class and New Jersey Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

48.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class and New Jersey Subclass members.  These common legal and factual questions include, but are not limited to, the following:

(a)    whether the Belviq Medications manufactured, distributed, and sold by Defendants exposed users to high rates of cancer and were unfit for use as medications, thereby

breaching implied warranties made by Defendants and making Belviq Medications unfit for human consumption and therefore unfit for their intended purpose;

(b)      whether Defendants knew or should have known that the Belviq Medications exposed users to high rates of cancer prior to selling the medications such that the risk of taking the Belviq Medications outweighed any benefit of the same;

(c)      whether Defendants are liable to Plaintiff and the Class and New Jersey Subclass for unjust enrichment;

(d)      whether Defendants are liable to Plaintiff and the New Jersey Subclass for violations of the NJCFA;

(e)      whether Defendants are liable to Plaintiff and the Class and New Jersey Subclass for breaches of implied warranties;

(f)      whether Plaintiff and the Class and New Jersey Subclass have sustained monetary loss and the proper measure of that loss;

(g)      whether Plaintiff and the Class and New York Subclass are entitled to restitution and disgorgement from Defendants; and

(h)      whether the marketing, advertising, packaging, labeling, and other promotional materials for Belviq Medications are deceptive.

49.      **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the Class and New Jersey Subclass in that Defendants mass marketed and sold defective Belviq Medications to consumers throughout the United States.  This defect was present in all of the Belviq Medications manufactured, distributed, and sold by Defendants.  Therefore, Defendants breached their implied warranties to Plaintiff and Class and New Jersey Subclass members by manufacturing, distributing, and selling the defective Belviq Medications.  Plaintiff's claims are

typical in that she was uniformly harmed in purchasing and consuming defective Belviq Medication.  Plaintiff's claims are further typical in that Defendants deceived Plaintiff in the very same manner as they deceived each member of the Class and New Jersey Subclass. Further, there are no defenses available to Defendants that are unique to Plaintiff.

50.    **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class and New Jersey Subclass.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class and New Jersey Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class and New Jersey Subclass.

51.    **Superiority.**    A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and New Jersey Subclass members are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for the Class and New Jersey Subclass, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class and New Jersey Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

52.    In the alternative, the Class and New Jersey Subclass may also be certified

because:

(a)    the prosecution of separate actions by individual Class and New Jersey Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and New Jersey Subclass members that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual Class and New Jersey Subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class and New Jersey Subclass members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class and New Jersey Subclass as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class and New York Subclass as a whole.

### COUNT I
**Breach Of The Implied Warranty Of Merchantability**
**(On Behalf Of Plaintiff, The Class, And The New Jersey Subclass)**

53.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the New Jersey Subclass against Defendants.

55.    Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Belviq Medications were (i) fit for use as weight loss medications, (ii) were not carcinogenic and unreasonably dangerous such that the risk of using the medication outweighed its benefits, and (iii) generally recognized as safe for human

consumption.

56.     Defendants breached the warranty implied in the contract for the sale of the defective Belviq Medications because they could not pass without objection in the trade under the contract description, the Belviq Medications were not of fair or average quality within the description, and the Belviq Medications were unfit for their intended and ordinary purpose because the Belviq Medications manufactured, distributed, and sold by Defendants were defective in that they are carcinogenic and not fit for use as a weight loss medication, and as such are not generally recognized as safe for human consumption.  The unmerchantable nature of the Belviq Medications is evidenced by the fact that the FDA required the Belviq Medications to be withdrawn from the market.  The fact that Defendants ceased manufacturing and distributing the medications at the request of the FDA, and instructed users to stop using and destroy the medications, shows that they are unmerchantable and unfit for human use.  As a result, Plaintiff and Class and New Jersey Subclass members did not receive the goods as impliedly warranted by Defendants to be merchantable.

57.     Plaintiff and Class and New Jersey Subclass members purchased Belviq Medications in reliance upon Defendants' skill and judgment and the implied warranties of merchantability and fitness for the purpose.

58.     The Belviq Medications were not altered by Plaintiff or Class and New Jersey Subclass members.

59.     The Belviq Medications were defective when they left the exclusive control of Defendants.

60.     Defendants knew that the Belviq Medications would be purchased and used without additional testing by Plaintiff and Class and New Jersey Subclass members.

61.     The defective Belviq Medications were defectively manufactured and unfit for their intended purpose, and Plaintiff and Class and New Jersey Subclass members did not receive the goods as warranted.

62.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class and New Jersey Subclass members have been injured and harmed because: (a) they would not have purchased Belviq Medications if they knew the medications caused a significantly elevated risk of cancer and that the medications are not generally recognized as safe for human consumption, or at minimum would have paid considerably less for them; and (b) the Belviq Medications do not have the characteristics, ingredients, uses, or benefits as promised by Defendants.  Plaintiff and members of the Class and New Jersey Subclass would have used a different medication, or other mechanisms for weight control had they known the truth about Belviq Medications.

63.     On November 10, 2021, Plaintiff provided Defendants with timely notice of this claim by letter that complied in all respects with U.C.C. § 2-607(3)(a).  The November 10, 2021 letter is attached hereto as **Exhibit A**.

## COUNT II
### Violation Of New Jersey's Consumer Fraud Act
### (On Behalf Of Plaintiff And The New Jersey Subclass)

64.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65.     Plaintiff brings this claim individually and on behalf of the members of the proposed New Jersey Subclass against Defendants.

66.     The New Jersey Consumer Fraud Act ("NJCFA") prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false

pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice… ." N.J.S.A. § 56:8-2.

67.    Plaintiff and members of the New Jersey Subclass are consumers who purchased the Belviq Medications for personal, family, or household use.

68.    Plaintiff and New Jersey Subclass members suffered an injury in fact and lost money or property as a result of Defendant's violations of the NJCFA.

69.    In violation of the NJCFA, Defendant employed unconscionable commercial practices, deception, fraud, and/or false pretense by manufacturing and selling the defective Belviq Medications to Plaintiff and members of the New Jersey Subclass. Defendants advertised Belviq Medications as safe and effective medications for weight loss, when in fact Defendants actively misrepresented the true nature of the medications to consumers.

70.    Defendants' deception was material in that it induced Plaintiff and members of the New Jersey Subclass to purchase the Products under false pretenses, namely that the Products were fit for their intended use as weight loss medications and that the risks of the medications did not outweigh the benefit of using them. Plaintiff and New Jersey Subclass members reviewed the labels, advertising, and/or marketing of Defendants' Products, reasonably acted in positive response to those representations and were thereby deceived. Plaintiff and New Jersey Subclass members would not have purchased Defendant's Product on the same terms but for Defendant's material misrepresentations regarding the true nature of the Products. Plaintiff and

members of the New Jersey Subclass who purchased Defendants' Products were overcharged for these products, which were worthless. At minimum, Plaintiff and members of the New Jersey Subclass paid a considerable price premium for the Products.

71.    Additionally, Defendants knowingly failed to disclose and concealed the defective nature of the Products with the intent that Plaintiff and members of the New Jersey Subclass rely on said concealment, in violation of the NJCFA. Specifically, Defendants Arena and Eisai both knew that the Belviq Medications were defective in that they were carcinogenic and ineffective for weight loss such that the risk of taking the medications outweighed any benefit, but failed to disclose such defects to Plaintiff or members of the New Jersey Subclass. Defendants' fraudulent omissions were material to Plaintiff and members of the New Jersey Subclass. When Plaintiff and members of the New Jersey Subclass purchased the Belviq Medications, they reasonably relied on the expectation that the Belviq Medications were (i) fit for use as weight loss medications, (ii) were not carcinogenic and unreasonably dangerous such that the risk of using the medication outweighed its benefits, and (iii) generally recognized as safe for human consumption. Had Defendants disclosed at or before the point of purchase that the Belviq Medications were ineffective, carcinogenic, and unsafe for human consumption, Plaintiff and members of the New Jersey Subclass would not have purchased the Belviq Medications or would they have paid considerably less for them.

72.    Defendants knowingly concealed, suppressed and/or omitted material information regarding the Belviq Medications, as set forth above, including the safety risk in the Belviq Medications at the time of sale and at all relevant times thereafter.

73.    Defendant owed a duty to disclose that the Belviq Medications were not fit for their intended use and its corresponding safety risk to Plaintiff and members of the New Jersey

Subclass because Defendant possessed superior and exclusive knowledge regarding the carcinogenic nature of the Belviq Medications.

74.     As set forth at length above, both Arena and Eisai knew before selling the Products that the Belviq Medications were unsafe for human consumption and that the risk of using the same outweighed any benefit of the Products.  Arena and Eisai worked together to market the Belviq Medications to treating physicians and consumers despite knowing the Belviq Medications were unfit for use.

75.     As a direct and proximate result of Defendant's wrongful conduct in violation of the NJCFA, Plaintiff and members of the New Jersey Subclass have suffered and continue to suffer ascertainable loss in the form of the purchase price paid for defective, worthless Belviq Medications.  At minimum, Plaintiff paid a considerable premium price for the Products.  The amount of the price premium can be reasonably quantified by an appropriate market study, through contingent variation study, or through other means regularly employed by economic and valuation experts.

76.     On behalf of herself and other members of the New Jersey Subclass, Plaintiff seeks to recover actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial.  *See* N.J.S.A. § 56:8-19.

77.     November 10, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter advising Defendant of its violation of the NJCFA and demanding full restitution.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit A**.

78.     In accordance with N.J.S.A. § 56:8-20, a copy of this complaint will be sent to the Attorney General within ten (10) days of filing the same.

## COUNT III
### Unjust Enrichment
### (On Behalf Of Plaintiff, The Class And The New Jersey Subclass)

79.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

80.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New Jersey Subclass against Defendants.

81.     Plaintiff and the Class and New Jersey Subclass conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective Belviq Medications, as set forth herein.

82.     Defendants voluntarily accepted and retained this benefit.

83.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for medications unfit for human use, it would be unjust and inequitable for the Defendants to retain it without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.     For an order certifying the nationwide Class and the New Jersey Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New Jersey Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and members of the New Jersey Subclass;

B.     For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiff, the nationwide Class, and the New Jersey Subclass on all counts asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For an order awarding Plaintiff and the Class and New Jersey Subclass their reasonable attorneys' fees and expenses and costs of suit.

### **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  November 11, 2021                  Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Andrew J. Obergfell*
             Andrew J. Obergfell

Andrew J. Obergfell
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 837-7150
Facsimile: (212) 989-9163
Email: aobergfell@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
701 Brickell Ave, Suite 1420
Miami FL, 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com

*Attorneys for Plaintiff*